OFFICIAL COMMITTEE OF UNSE-CURED CREDITORS OF GRAND EAGLE COMPANIES, INC. et al., Plaintiff

v.

ASEA BROWN BOVERI, INC., et al., Defendants

No. 5:03–CV–551.

United States District Court, N.D. Ohio.

March 31, 2004.

Alan M. Koschik, Brouse McDowell, Cleveland, Joseph F. Hutchinson, Jr., Brouse McDowell, Akron, Marc B. Merklin, Brouse McDowell, Jessica E. Price, Brouse McDowell, Cleveland, Kate M. Bradley, Brouse McDowell, Akron, for Official Committee Unsecured Creditors of Grand Eagle Companies, Inc., Plaintiff.

M. Colette Gibbons, Schottenstein, Zox & Dunn, Patrick J. Brooks, Squire Sanders & Dempsey, Cleveland, Mark S. Lichtenstein, Bryan Cave, Thomas J. Schell, Bryan Cave, Benjamin Hoch, Dewey Ballantine, New York, NY, Jeffrey M. Levinson, Margulies & Levinson, Beachwood, for ASEA Brown Boveri, Inc., Keystone Venture IV LP, Inroads Capital Partners, Blue Chip Opportunity Fund LTD Partnership, Blue Chip Capital Fund LP, Grand Eagle Assoc LP, Grand Eagle Assoc II LP, Jerry O. Williams, William R. Givens, Richard B. Black, Credit Agricole Indosuez, Key Corporate Capital Inc. Prudential Insurance Company of America, LaSalle Bank NA Indosuez Capital Funding VI LTD Rob–Wal Investment Co., Defendants.

Mark A Phillips, Benesch, Friedlander, Coplan & Aronoff, Cleveland, for Glenn C. Pollack, trustee.

## OPINION & ORDER

GWIN, District Judge.

On February 28, 2002, the Official Committee of Unsecured Creditors (the "Committee"), but not the Trustee, commenced an adversary action against the Defendants. After the Defendants demanded a jury trial and refused to consent to a jury trial before the bankruptcy court, this Court withdrew the reference.

Following the withdrawal, the Defendants appealed the bankruptcy court's decision finding the Committee enjoyed derivative standing to pursue the adversary litigation. In an order of November 20, 2003, U.S. District Judge Dan Aaron Polster remanded the matter to the bankruptcy court to conduct a further hearing on

the issue of the Committee's derivative standing. Upon completion of the hearing, the bankruptcy court issued a written recommendation to this Court. [Doc. No. 42]

In that recommendation, the bankruptcy court found that the Committee has direct standing to pursue the equitable subordination claim against the Pre–Petition Lenders and derivative standing to pursue the remaining claims against the Lenders. The bankruptcy court made no recommendation regarding the Committee's standing to bring claims against the other Defendants since the Trustee had commenced actions against these Defendants in December 2003.

The Former Shareholders now move to dismiss the claims brought by the Committee. [Doc. No. 38]. Because the Trustee has independently made similar claims, the Former Shareholders say the Committee lacks standing to independently bring the same claims. Defendant Asea Brown Boveri, Inc. similarly moved to dismiss the claims brought by the Committee. [Doc. No. 35].

In a related matter, the Former Shareholders object to a stipulation filed in bankruptcy court that would require the Trustee to seek Committee approval before settling or compromising his claims with the Former Shareholders. [Doc. No. 48]. The Committee moves to strike the objection, arguing that it is not properly before this Court. [Doc. No. 62, 64]. The Former Shareholders additionally object to the bankruptcy court's conclusion that the Committee has standing to pursue claims on behalf of the estate against the Pre–Petition Lenders. [Doc. No. 49].

The Pre–Petition Lenders have filed notice that they support a settlement agreement between themselves and the Committee but continue with their objections to the Committee's standing they had made earlier. [Doc. No. 47]. As this Court previously concluded, such an agreement can only be considered for approval if the Committee is found to have standing to bring the avoidance action against the Pre–Petition Lenders.

For the reasons set out below, the Court dismisses the Committee's claims against the Former Shareholders and Asea Brown Boveri, Inc. The Court also denies the Committee's motion to strike and concludes that the No–Settlement Stipulation between the Trustee and the Committee is not enforceable. The Court does find that the Committee has standing to bring a direct equitable subordination claim and a preference claim against the Pre–Petition Lenders on behalf of the bankruptcy estate. However, the Committee has not asserted a colorable fraudulent conveyance claim.

## I. BACKGROUND

On December 7, 2001, Grand Eagle Companies, Inc. ("Grand Eagle") and five of its wholly owned subsidiaries filed voluntary chapter 11 bankruptcy petitioners. The bankruptcy court jointly administers the bankruptcies of both Grand Eagle and the Subsidiaries.

On February 28, 2002, the Committee sued sixteen defendants including Asea Brown Boveri, Inc, the Pre–Petition Lenders[1] and the Former Shareholders.[2] With

1. The Pre–Petition Lenders are Credit Agricole Indosuez, Key Corporate Capital, Inc., La Salle Bank, N.A., Indosuez Capital Funding VI, Ltd., Rob–Wal Investment Co., and Prudential.

2. The Former Shareholders are Keystone Venture IV, L.P.; Inroads Capital Partners; The Blue Chip Opportunity Fund Limited Partnership; The Blue Chip Capital Fund, L.P.; Grand Eagle Associates, L.P.; Grand

its July 11, 2002, amended complaint, the Committee alleges fraudulent transfer under Ohio and Illinois law and seeks disallowance of claims of all the Defendants. Additionally, the complaint sets forth illegal corporate dividend distribution and stock redemption claims against Asea Brown Boveri and the Former Shareholders. The complaint also makes preference claims against the Pre–Petition Lenders, breach of fiduciary duty claims against the Former Shareholders, and equitable subordination and other equitable claims against the Pre–Petition Lenders.

The Defendants challenged the standing of the Committee to bring its Adversary Proceeding in bankruptcy court. In general, the Defendants argued that only the Trustee could bring the claims in the Adversary Proceeding. The Defendants also argued that even if claims could be made by a creditors' committee, the grounds for approval under *Canadian Pac. Forest Prod. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436 (6th Cir. 1995) are absent in this case. Finally, the Defendants argued that any litigation needed to have been filed by February 28, 2002. Although the Committee filed its action on that date, the Defendants say the Committee could not bring the action absent bankruptcy court approval by that date.

On June 27, 2002, the bankruptcy court considered these objections and ruled that the Committee had standing to make the claims. The Pre–Petition Lenders and Former Shareholders appealed the bankruptcy court's standing decision. This appeal was assigned by lottery to the U.S. District Judge Dan Aaron Polster.

On January 29, 2003, the Former Shareholders moved this Court to withdraw the reference to the adversary proceeding as to all Defendants. The Pre–Petition Lenders joined in this motion. On March 26, 2003, this Court withdrew the reference of the entire Adversary Proceeding.

On September 26, 2003, the Committee filed a motion with the bankruptcy court seeking approval of a Settlement Agreement between the Pre–Petition Lenders and the Committee. Since the Settlement Agreement partially resolved the adversary proceeding that had been wholly withdrawn, this Court requested that the bankruptcy court act in a magistrate capacity.[3] After certain proceedings before Judge Polster and this Court, the bankruptcy court issued its report and recommended that the Committee had standing to bring the adversary proceeding against the Pre–Petition Lenders.[4] This Court now entertains objections to that report and recommendation.

## II. DISCUSSION

 The primary issue currently before the Court is whether the Committee has standing to bring an avoidance action against the Defendants in the adversary proceeding. Generally, a creditors' committee has no standing to assert causes of action normally belonging to the estate. Instead, such responsibility resides with the trustee. However, a creditor's committee, in limited circumstances, can make such claims. The Court now examines the background of this rule and determines

---

Eagle Associates II, L.P.; Jerry O. Williams; William R. Givens, and Richard B. Black.

3. In such a role, the Bankruptcy Court submits proposed findings of fact and conclusions of law to the district court for *de novo* review.

4. The bankruptcy court expressly noted that it was not deciding if the Committee had standing to bring adversary proceedings against the Former Shareholders and Asea Brown Boveri since the Trustee had commenced adversary proceedings against these Defendants.

whether an exception exists in this case that would allow the Committee to make such a claim.

■ The Bankruptcy Code states that "the trustee may avoid" preferential and fraudulent transfers. 11 U.S.C. §§ 547, 548. Despite the explicit assignment of this responsibility to trustees, the Sixth Circuit recognizes that in certain *limited* contexts a creditors' committee can obtain authority to bring an avoidance action on behalf of the estate. *Jefferson Co. Bd. of Comm'rs v. Voinovich (In re The V Companies)*, 292 B.R. 290 (6th Cir. BAP 2003) (concluding that *In re Gibson Group* is valid subsequent to *Hartford Underwriters); Canadian Pacific Forest Products Ltd. v. J.D. Irving, Ltd. (In re Gibson Group)*, 66 F.3d 1436 (6th Cir.1995). Specifically, a bankruptcy court may grant a creditors' committee derivative standing to bring an avoidance action where (1) a demand has been made upon the trustee to take action; (2) the demand is declined; (3) a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court; and (4) the trustee's inaction is an abuse of discretion in light of his duties in the bankruptcy case. *In re Gibson Group*, 66 F.3d at 1446.

■ Courts must carefully consider the *Gibson* factors before granting derivative authority to an creditors' committee because the committee's role is different from the trustee's. A trustee acts for the benefit of the estate and owes a fiduciary duty to all creditors of the estate. *See, e.g., In re Troy Dodson Construction Company*, 993 F.2d 1211, 1216 (5th Cir. 1993). In contrast, a committee of unsecured creditors is a fiduciary only to the creditors it represents and must act vigorously to pursue their interests. *See, e.g., In re SPM Mfg. Corp.*, 984 F.2d 1305, 1315–16 (1st Cir.1993); *In re Great Northern Paper, Inc.*, 299 B.R. 1 (D.Me.2003). A creditors' committee need not consider the best interests of the estate. *In re SPM Mfg. Corp.*, 984 F.2d at 1315–16. As the bankruptcy court notes, the interests of a creditors' committee and the trustee may sometimes align. Yet the interests of a creditor's committee and the trustee are not identical.[5] Outside the context of being granted derivative standing, the committee represents the unsecured creditors, not the estate. Consequently, the Court finds it imperative that bankruptcy courts give sufficient attention to the *Gibson* factors before granting derivative standing to a creditors' committee.[6]

## A. Standing of Former Shareholders to Object

■ Although the bankruptcy court did not examine the standing of the Committee in relation to the Former Shareholders, the bankruptcy court, at astounding length, discusses the authority of the Former Shareholders to raise the issue of the Committee's standing. The Court prelimi-

5. In their objection to the No–Settlement Stipulation, the Former Shareholders offer instances in which the interests of the Committee and the Trustee are not aligned. Since Grand Eagle is administratively solvent, the Trustee's duties run first to the administrative claimants. The Committee's duties are strictly to the unsecured creditors. Second, the Trustee is obligated to conserve the assets of the estate to the extent possible. No such duty binds the Committee.

6. The bankruptcy court suggests that perhaps the *Gibson* test should not be applied to creditors' committees but only to individual creditors seeking derivative standing. The Court does not read *Gibson* this narrowly. In fact the *Gibson* court explicitly held that "a creditor or a creditors' committee may have derivative standing to initiate an avoidance action" only where the four *Gibson* factors are met. 66 F.3d at 1446.

nary addresses this point to clarify that the Former Shareholders may object to the Committee's standing to bring the avoidance action, both against the Pre–Petition Lenders and against themselves.

In pertinent part, the Bankruptcy Code states:

> A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

11 U.S.C. § 1109(b). Case law interprets the statutory language "party in interest" expansively. *See, e.g., In re Hathaway Ranch Partnership,* 116 B.R. 208, 213 (Bankr.C.D.Cal.1990). Courts will often consider whether the prospective party in interest has a sufficient stake in the outcome of the proceeding to require representation. *See, e.g., E.F. Hutton & Co. v. Hadley,* 901 F.2d 979, 985–86 (11th Cir. 1990).

Under this standard, the Court concludes that the Former Shareholders have standing to object to the standing of the Committee to prosecute the action against the Pre–Petition Lenders. The Former Shareholders have a pecuniary interest in the outcome of the proceeding based on their interest in the escrowed funds that are at issue in the Committee's action against the Pre–Petition Lenders. Since the Committee seeks the entire return of the purchase price of Grand Eagle for the benefit of the creditors, the action implicates the Former Shareholder's interest in the escrowed funds.

■ Even if the Former Shareholders lack standing to object, the Court must still consider the Pre–Petition Lenders' objections. The Pre–Petition Lenders, although desirous of settlement with the Committee, technically continue to object

to the Committee's standing to bring claims against them.

Moreover, even in the absence of objections by the parties, this Court must ensure that the Committee's action against the Pre–Petition Lenders satisfies the *Gibson* test. Under *Gibson,* before finding a committee has standing, courts must ensure that claims brought by a creditors' committee are colorable and of benefit to the estate, regardless of any formal objections. Such a requirement follows from the fact that creditors' committees generally are not required to act in the best interests of the estate. Therefore, this Court carefully examines the appropriateness of the Committee's commencement of the avoidance action against the Pre–Petition Lenders.

The bankruptcy court suggests that the Former Shareholders also cannot appeal the issue of the Committee's standing to assert an action against the Former Shareholders. The bankruptcy court reasons that the issue of the Committee's standing is an issue involving the main bankruptcy case, not the withdrawn adversary proceeding. Since the bankruptcy court believes that the Former Shareholders are not parties in interest in the main bankruptcy case, the bankruptcy court concludes that they do not have standing to appeal the derivative standing of the Committee. The bankruptcy court cites no case law directly supporting her position but contends that *Gibson* leaves the issue open since it did not involve an appeal by the would-be-defendant.

Although *Gibson* was brought by the would-be-plaintiff creditor, in *In re The V Companies,* 292 B.R. 290, the Sixth Circuit Bankruptcy Appellate Panel allowed an appeal on the issue of standing by the defendants in an avoidance action. The case involved an appeal from a bankruptcy

court's grant of derivative standing to a creditor. Based on this derivative standing, the creditor pursued an avoidance action against certain would-be-defendants, including former officers, owners, and shareholders of the debtor companies. *Id.* at 292–93. Addressing the would-be defendants' arguments on the merits, the Sixth Circuit Bankruptcy Panel implicitly concluded that defendants to the avoidance proceeding have standing to appeal the committee's derivative standing. *Id.* at 293. The Court sees no significant difference with the instant case.

### B. Standing of Committee to Bring Action Against Former Shareholders

■ Finding that the Former Shareholders may object to the Committee's standing, the Court turns to whether the Committee has standing to bring an avoidance action against the Former Shareholders. Under *Gibson,* a creditors' committee has standing only when a trustee unjustifiably refuses to bring the avoidance action. 66 F.3d at 1446. Any right a creditors' committee has to prosecute the avoidance action under *Gibson,* therefore, is extinguished when the trustee commences suit with similar claims. *See In re Commodore Intl', Ltd.,* 253 B.R. 336, 339 (S.D.N.Y. 2000). Here, the Trustee has brought avoidance actions against the Former Shareholders and Asea Brown Boveri, Inc.[7] Both the Trustee and the Committee make nearly identical claims. Thus, there is no showing that the Trustee unjustifiably denied a demand to bring an action.

The Court dismisses the Committee's claims against the Former Shareholders and Asea Brown Boveri since the Trustee filed an action substantially similar to the Committee's.[8]

### C. The No–Settlement Stipulation

■ Although the Trustee has commenced an avoidance action against the Former Shareholders and Asea Brown Boveri, the very action the Committee urged the Trustee to take in early 2002, the Committee is not satisfied. Having once controlled the litigation against these defendants, the Committee is apparently now unwilling to release its grip on the action. In a stipulation filed on January 21, 2004, the Trustee and the Committee agreed as follows:

> The Trustee agrees not to file a motion to settle and compromise under Rule 9019 of the Federal Rules of Bankruptcy Procedure with the Former Shareholders and/or Asea Brown Boveri, Inc. ("Asea Brown") or either of them, without first consulting with Committee counsel and obtaining the Committee's agreement not to oppose the proposed motion to settle and compromise."

The Former Shareholders object to this restraint on the Trustee and to the Committee's ongoing involvement in the action against the Former Shareholders. In response, the Committee argues that this Court lacks jurisdiction to hear this objection since the Court has only withdrawn the adversary proceeding and not the en-

---

7. The Trustee did not bring action against the Pre–Petition Lenders, the remaining defendants in the Committee's actions.

8. The Court notes that it had earlier dismissed Asea Brown Boveri's motion to dismiss and requested that the bankruptcy court finish the standing hearing. Since the Trustee had filed suit, the Court might have dismissed the action by the Committee at that time. The

Court, however, thought it better to address the Committee' standing against all of the defendants after a completed standing hearing and a written recommendation from the bankruptcy judge. However, since standing can be raised *sua sponte,* the Court now dismisses the Committee's action against Asea Brown Boveri.

tire bankruptcy case. Finding that this portion of the stipulation directly implicates the avoidance action currently before this Court in *Pollack v. Asea Brown Boveri*, 04–CV–0050, the Court finds that it has jurisdiction and denies the Committee's motion to strike the objection.[9]

The Court again notes the limited authority creditors' committees possess to act on the behalf of the estate. The *Gibson* case illuminates that a court may grant such authority only when the trustee has abdicated his responsibility to act as a fiduciary for the estate by not bringing a valuable avoidance action. 66 F.3d at 1443. Once the trustee assumes the responsibility and no longer is unreasonably refusing to bring the litigation, the committee's authority disappears. *See, e.g., In re Commodore Intl', Ltd.*, 253 B.R. 336.

As described above, the Committee and the Trustee represent different interests. To the Court's understanding, the circumstances present real potential for conflicted interest. The Trustee describes the estate as short on cash and unable to complete a plan absent a settlement with the Pre–Petition Lenders. Despite having little cash to administer the estate, the estate will bear the cost of all litigation, which cost will be significant. Unless recovery is obtained, the estate will be unable to pay even administrative claims. If recovery is obtained, the broad majority will inure to the benefit of the unsecured creditors. An obvious divergence of interests exists. The Bankruptcy Code places responsibility for resolving these differing creditor interests squarely with the Trustee.

If the Court were called on to enforce this no-settlement stipulation, it would be authorizing the ongoing involvement of the Committee in pursuing the claims against the Former Shareholders and Asea Brown Boveri. Once the Trustee has filed suit, the reasoning of *Gibson* precludes the Committee from continuing to pursue the avoidance action. The Trustee's fiduciary obligation to the estate cannot be compromised by some agreement to accede to the position of the Committee. While the interests of the unsecured creditors should be considered by the Trustee, they should not, alone, control the Trustee.

### D. Derivative Standing of Committee Regarding Claims Against Pre–Petition Lenders

Having dismissed the Committee's actions against the Former Shareholders and Asea Brown Boveri, Inc, the Court next turns to the Committee's standing to bring claims against the only remaining defendants, the Pre–Petition Lenders. As previously discussed, the Committee may only assert a derivative claim against the Pre–Petition Lenders where the *Gibson* factors are met.

With its avoidance action against the Pre–Petition Lenders, the Committee makes three claims for relief: an equitable subordination claim, a fraudulent transfer claim, and a preference claim. Upon a review of the complaint and the factual basis and evidence proffered at the standing hearing, the Court concludes that the Committee has standing to assert a direct equitable subordination claim and a derivative preference claim against the Pre–Petition Lenders. The Court finds that the Committee has not asserted a colorable fraudulent transfer claim against the Pre–Petition Lenders, however.

---

9. The Court observes that the Former Shareholders might more properly have filed their objection in 04–CV–0050 since the stipulation involves the Trustee's action. Because the Court had not yet ruled on the Former Shareholders' motion to dismiss the action brought by the Committee, the Court concludes that the objection is proper here.

■ Before addressing the colorability of the claims, this Court turns to the preliminary issue of whether the Committee's failure to obtain an order granting it standing prior to the February 28, 2002 deadline is fatal to its action against the Pre–Petition Lenders.

In a Cash Collateral Order drafted by the parties, the parties agreed that an adversary proceeding challenging the Pre–Petition Lenders liens needed to be commenced before February 28, 2002. The Committee filed its action by that deadline but did not obtain the approval of the bankruptcy court until after the deadline.

In her recommendation, the bankruptcy judge observes that the Cash Collateral Order placed an obligation on the Committee only to file the action before the deadline. Moreover, the bankruptcy court recommends that this Court find that retroactive approval by the bankruptcy court is sufficient to confer standing on the Committee.

The Court concludes that the bankruptcy court properly interpreted the Cash Collateral Order to require the filing of the action, not the approval of the action, by the deadline. *See, e.g., In re Williams*, 256 B.R. 885, 893 (8th Cir. BAP 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 947 (Bankr.N.D.Ohio 1987). Thus, the Court finds the Committee's failure to obtain the bankruptcy court's approval before the deadline is not fatal to its ability to pursue the claims.[10]

### i. *Equitable Subordination Claim*

■ The Court individually addresses each claim brought by the Committee against the Pre–Petition Lenders. With respect to its equitable subordination claim, the Committee seeks to subordinate the liens of the Pre–Petition Lenders. The bankruptcy court determined that the Committee has the direct authority to bring a claim for equitable subordination. Therefore, the *Gibson* derivative standing analysis is inapplicable. The Former Shareholders do not dispute that the Committee may bring a direct equitable subordination claim but argue that the Committee made a derivative equitable subordination claim in its complaint. The Committee asserts that it brings the claim directly.

Section 510(c) of the Bankruptcy Code provides, in relevant part, that the bankruptcy court may:

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest . . .

Under this provision, courts hold that a creditor or creditors' committee may directly assert equitable subordination claims. *See, e.g., In re Vitreous Steel Products*, 911 F.2d 1223, 1231 (7th Cir. 1990); *Tenn. Valley Steel Corp. v. B.T.*

---

10. The Former Shareholders assert that under Sixth Circuit law a creditors' committee cannot be granted authority to commence an action retroactively. The cases cited by the Former Shareholder, however, stand only for the proposition that under *Gibson* the creditor must seek and obtain approval. *See, e.g., Greenlee v. Mather*, No. 98–17061, 2000 WL 620817 (Bankr.S.D.Ohio March 13, 2000). Cases that have directly dealt with the issue of retroactive authorization have concluded that a bankruptcy court may retroactively grant the necessary approval. *See, e.g., Liberty Mutual Ins. Co. v. Official Unsecured Creditors' Committee of Spaulding Composites Co., (In re Spaulding Composites Co. Inc.)*, 207 B.R. 899, 905 (9th Cir. BAP 1996); *In re America's Hobby Center, Inc.*, 223 B.R. 275, 281 (Bankr. S.D.N.Y.1998).

*Comm. Corp.,* 183 B.R. 795, 799 (Bankr. E.D.Tenn.1995).

Consistent with the language of the Bankruptcy Code 510(c) and case law, the Court concludes that the Committee has direct standing to bring the equitable subordination claim. Because the Committee disavows that its complaint brings a derivative equitable subordination claim, the Court need not determine if the Committee has derivative standing to bring such a claim. The complaint, however, is ambiguous regarding whether the Committee brings a direct or derivative equitable subordination claim. Therefore, the Court directs the Committee to file an amended complaint clarifying that it brings only a direct equitable subordination claim.

### ii. Fraudulent Transfer Claim

■ The Committee also seeks to avoid the Pre–Petition Lenders' claims as fraudulent conveyances under Ohio fraudulent transfer law. To show a colorable fraudulent transference claim against the Lenders, the Committee must set forth particularized facts as to all of the following:

(1) That the several transactions on April 7, 2000 should be collapsed for the purpose of a single transaction.

(2) That the debtor did not receive reasonable equivalent value in exchange for the transfer or obligation. (Ohio Rev. Code § 1336.04(A)(2)).

(3) That one of the following conditions existed on April 7, 2000:

(a) The debtor was insolvent at the time or the debtor became insolvent as a result of the transfer. (Ohio Rev.Code § 1336.05(A))

(b) The debtor was left with insufficient or unreasonably small assets to conduct business (Ohio Rev.Code. § 1336.04(A)(2)(a)), or

(c) The debtor intended to incur, believed, or reasonably should have believed that he would incur debts beyond his ability to pay as they came due. Ohio Rev Code § 1336.04(A)(2)(b).

The Committee asserts that the transactions on April 7, 2000 constituted a complex leveraged buyout. This leveraged buyout included two stock acquisitions and a bank loan facility. In one stock acquisition, Grand Eagle Companies purchased the stock of ABB Services, Inc. from Asea Brown. In the other stock acquisition, Private Equity Investors, an entity controlled by Desai Capital Management, purchased the stock of Grand Eagle. In the bank loan facility, the Pre–Petition Lenders and Grand Eagle entered a loan transaction that provided funds used to complete the acquisition. The Committee urges the Court to consider the transactions of April 7, 2000 as a single, integrated transaction.

■ Courts will generally look past the form of a transaction to its substance. "Thus an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications." *Orr v. Kinderhill Corp.,* 991 F.2d 31, 35 (2d Cir. 1993) (internal quotations and citations omitted).

For the Committee to prevail on its fraudulent transfer theory, it is necessary that the Court treat the April 7, 2002 transactions as a single transaction. The Former Shareholders argue that the Court should not collapse the transactions because the ratio of new equity to total debt is too high to warrant the collapsing of the transactions.

To complete the April 7, 2000, acquisitions. Grand Eagle borrowed $77.5 million from the Pre–Petition Lenders. Pri-

vate Equity Investors contributed another $27.5 million new equity. Of the $105 million total, Grand Eagle purchased ABB Services for $42.2 millions. Another $41.6 million was used to retire prior debt. The Former Shareholders received $15.8 million. Another $5.1 million was used to pay professional and bank fees. At the conclusion of the transactions, the debtors were left with $300,000 in excess cash.

With a substantial amount of new money infused into the company, the Court finds no reason to collapse the transactions. Generally, courts collapse transactions in leveraged buyouts since the purchaser usually invests only a modest, if any, amount of its own capital as new equity. *See* David W. Morse, *Legal Issues in Leveraged Acquisitions: From the Lenders Perspective,* 1404 PLI/Corp 1281, 1287 (2004). In light of the new equity invested by purchaser Private Equity Investors and the expected synergy from the combination of ABB Services with Grand Eagle, the Court finds that the transactions are not a typical leveraged buyout and should not be collapsed. *See, e.g., In re Sunbeam Corp.,* 284 B.R. 355, 373 (Bankr.S.D.N.Y. 2002) (refusing to collapse a transaction where the lenders had *no* knowledge that the debtor was or would be rendered insolvent by the acquisitions); *In re C–T of Virginia, Inc.,* 124 B.R. 694, 699 (W.D.Va. 1990) (refusing to collapse an leveraged buyout because the buyers invested $4 million of new capital and facts suggested that the company would continue).

Cases where courts have collapsed transactions are distinguishable from the Grand Eagle transactions. For example, in *United States v. Tabor Court Realty,* 803 F.2d 1288 (3d Cir.1986), the court collapsed the transactions. However, in *Ta-*

*bor,* the acquirer put in only 8% of the purchase price for the new entity, and the debtor had actual knowledge that the loans incurred to complete the acquisition would render the debtor insolvent. Similarly, in *Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488 (N.D.Ill.1988), the purchaser borrowed the entire purchase to acquire a company. In the Grand Eagle transactions the ratio of new cash equity to debt was 47%. This is not the factual situation in which other courts have collapsed transactions.

Relatedly, the Committee adduces no evidence that the Pre–Petition Lenders had any knowledge that acquisition would render the debtor insolvent and unable to pay future creditors.[11] With such a high level of new equity and no evidence of knowledge on the part of the Lenders that the acquisition would harm future creditors, the Court declines to collapse the transactions. *See In re Sunbeam,* 284 B.R. at 373 (Bankr.S.D.N.Y.2002).

Although not controlling, the equities of the instant case also support a finding not to collapse the transactions. The Pre–Petition Lenders, who were wholly unrelated to the Former Shareholders, lent large sums and remain the biggest unsecured creditor. No reason emerges why the Pre–Petition Lenders would facilitate an effort to disadvantage unsecured creditors. In contrast, the unsecured creditors appear to have all extended credit to the bankrupt after the transaction closed. Having sold goods and services to the bankrupt after the transaction closed, the unsecured creditors were in a better situation than the Pre–Petition Lenders to understand the prospects for repayment.

---

**11.** The Court notes that the Committee represents unsecured creditors of the debtor who became creditors post-acquisition.

Finding no basis for collapsing the several transactions, the Court concludes that the Committee fails to assert a colorable fraudulent conveyance claim against the Pre–Petition Lenders. Without a collapsing of the transactions, the Court considers the transactions separately. The transaction involving the Pre–Petition Lenders is the loan of $77.5 million to Grand Eagle in return for various liens. When considered separately, the Committee has not shown that the debtor did not receive reasonably equivalent value for this transaction. Thus, the Committee has not asserted a colorable claim regarding this transaction.

Moreover, the Committee has not shown that the Pre–Petition Lenders had knowledge that the Debtor was overpaying for the acquisition of ABB Services through the stock purchase. Although the Pre–Petition Lenders were aware that part of the loan proceeds would be used to purchase ABB Services, this is insufficient to show a fraudulent conveyance. The purchase by a company of another company is a legitimate corporate expenditure. *See In re Sunbeam Corp.,* 284 B.R. 355, 372 (Bankr.S.D.N.Y.2002). The fact that the combining of ABB Services and Grand Eagle later turned out to be unprofitable does not show knowledge on the part of the Lenders that the acquisition was worth less than Grand Eagle paid or that the Debtor was or would be rendered insolvent by the transaction. The Lenders also were aware the Private Equity Investors was contributing a significant amount of new equity to the Debtor and were aware of the expected synergistic effect from the combining of companies. In such an instance, the Court finds that the Committee has not set forth sufficiently particularized facts supporting a finding that the Pre–Petition Lenders had either actual or constructive knowledge of a fraudulent scheme that might lead to a colorable fraudulent conveyance claim against them.

### iii. Preference Claim

■ The Committee also alleges a preference claim under 11 U.S.C. § 547(b). Specifically, the Committee asserts that the Debtors transferred property to the Pre–Petition Lenders during the 90 days before the filing of the Debtors' bankruptcy petitions.

Section 547(b) provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in the property-

(1) to or for the benefit of a creditor:

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made-

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such a creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if-

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The parties acknowledge that the Pre–Petition Lenders received loan payments during the preference period. Further-

more, the testimony of Mr. King and Mr. Speers that the Debtors were not paying their debts as they came due, is sufficient to suggest that the Debtors were insolvent when the alleged preferential transfers were made. Moreover, as a matter of law, a debtor is presumed to be insolvent for the 90 days prior to bankruptcy. 11 U.S.C. § 547(f). Accordingly, the Court agrees that the Committee's preference claim is not without merit.

Under *Gibson*, the claim must be both colorable and, if successful, beneficial to the estate. The bankruptcy court found that testimony of Michael Fixler, director at Candlewood Partners, the financial advisor of the Chapter 11 Trustee, established that the Committee's claims were beneficial to the estate. Mr. Fixler testified that absent recovery in the Committee Action, the administrative claims will not be paid in full and priority and general unsecured claims will not be paid at all. If successful, the recovery will be sufficient to fund all of the administrative expense claimants and priority creditors and some unsecured creditors' claims.

## III. CONCLUSION

For the foregoing reasons, the Court dismisses the Committee's claims against the Former Shareholders [Doc. No. 38] and Asea Brown Boveri, Inc [Doc. No. 35]. The Court also denies the Committee's motion to strike [Doc. Nos. 62, 64] and concludes that the No–Settlement Stipulation between the Trustee and the Committee is not enforceable. The Court does find that the Committee has standing to bring a direct equitable subordination

claim and a preference claim on behalf of the bankruptcy estate against the Pre–Petition Lenders. However, the Committee has not asserted a colorable fraudulent conveyance claim against the Pre–Petition Lenders. Finally, the Court observes that this opinion does not approve of any settlement agreement that may exist between the Committee and the Pre–Petition Lenders. The parties are ordered to move the Court for such approval, if so desired.[12]

IT IS SO ORDERED.

12. In an order of November 24, 2003, the Court refused to consider a settlement agreement between the Committee and the Pre–Petition Lenders until after resolution of the Committee's standing to bring the avoidance proceeding. Since numerous changes have occurred in the case since November 24, the Court does not assume that the settlement agreement that the Committee earlier asked the Court to approve is the same settlement agreement that may now exist between the parties. For this reason, the Court orders that the parties motion for approval of the settlement agreement.